**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 17-cv-61378-BLOOM/Valle**

INTERIM HEALTHCARE INC.,

      Plaintiff,

v.

HEALTH CARE@HOME, LLC and
STEVEN COHN,

      Defendants.

_____/

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

      **THIS CAUSE** is before the Court following a five-day bench trial that began on September 11, 2018 and ended on September 18, 2018.  The parties submitted their closing arguments in writing, ECF Nos. [176], [177], [182], [184], and proposed findings of fact and conclusions of law following the filing of the trial transcripts.  *See* ECF No. [180] (Defendant's Proposed Findings of Fact and Conclusions of Law); ECF No. [178] (Plaintiff's Proposed Findings of Fact and Conclusions of Law).  The Court has carefully considered the evidence presented at trial, the applicable law, and the parties' submissions.  Set forth below are the Court's relevant findings of fact and conclusions of law.

## I.    INTRODUCTION

      Plaintiff Interim Healthcare, Inc. ("Plaintiff" or "Interim") is a franchisor of a franchise system that provides nursing, therapy and non-medical home care, hospice, and healthcare staffing services.  Defendant Health Care@Home, LLC ("Defendant" or "HCH") purchased an existing Interim franchise located in Phoenix, Arizona.  Interim filed this lawsuit on July 11, 2017, alleging

that HCH breached the Franchise Agreement with Interim.[1]  Interim asserts two claims for breach of contract against HCH for failure to pay past due royalties (Count I), and payment of future royalties (Count III), for which it seeks monetary damages and an award of attorneys' fees and costs.  *See* ECF No. [1].  Defendant HCH maintains that Interim induced it to purchase the Phoenix franchise through a series of misrepresentations and omissions of material facts and breached the Franchise Agreement.  As a result, HCH asserts six counterclaims against Interim for violations of the Florida Deceptive and Unfair Trade Practices Act (Counts I and II), fraud in the inducement (Count III), breach of contract (Count IV), breach of the covenant of good faith and fair dealing (Count V), and violation of the Florida Franchise Act (Count VI), seeking monetary damages and an award of attorneys' fees and costs.  *See* ECF Nos. [61], [80], [81].

## II.    FINDINGS OF FACT

### A.  The companies involved

Interim is a Florida corporation with its principal place of business in Sunrise, Florida. Interim started in its current form in 1966 and has about 335 offices managed by about 129 owner groups.  Interim is in the business of selling franchises that provide home care services ranging from non-skilled non-medical services to in-home skilled nursing care and therapy.  According to Interim's Franchise Disclosure Document ("FDD"), Interim franchisees "provide the temporary services of health care personnel such as registered nurses; licensed practical nurses; nurse aides; personal care aides; and companions to provide health care and support services directly to individuals, and as temporary staff to other health care providers and facilities."  ECF Nos. [162-2], [164-6].  The franchises are generally locally owned and operated by franchisees.  Not only

---

[1] Interim also asserted a claim against Defendant Steven Cohn personally, which was subsequently settled, and was therefore not tried.

does Interim sell new franchises, but it also resells existing franchises, often utilizing the services of a franchise broker.

AGK Southwest, Inc. ("AGK") was an entity that owned and operated two Interim franchises in Tucson and Phoenix, Arizona.  AGK was owned by Gregory Korpita ("Korpita") and Andrew Kasper ("Kasper").

HCH is an Arizona limited liability company with a principal place of business in Phoenix, Arizona, which was formed in order to operate the Phoenix franchise of Interim, after purchase from AGK in the summer of 2013.  At that time, HCH was owned by Steven Cohn, and by the time of trial in the instant case, Mark Cohn, Steven Cohn's brother, was the managing member of HCH.

**B.  The Cohns**

Steven Cohn is a resident of Tempe, Arizona and obtained an economics degree from Stanford University and a law degree from the Ohio State University.  He testified that he was been involved in business since 1977 and became involved in managing hotels in the late 1980s. Most of his experience is with hotels, but he also has experience with commercial real estate like shopping centers and office buildings.  He also had been involved in other franchise relationships, prior to purchasing the Phoenix Interim franchise.

Mark Cohn is a resident of Chandler, Arizona and obtained a degree in economics and physics from Stanford University and a Juris Doctor from the University of Southern California. He practiced law for about five years, becoming increasingly involved in business with his older brother, Steven Cohn.  He has a varied business background, including running a commercial finance company, and involvement in real estate transactions and the hotel business.  He testified that at one point, his net income peaked at approximately $250,000.00 per week.  Testimony

revealed that he was convicted for his involvement in a financial fraud scheme related to his time as a minority owner and operator of a finance company.

By all accounts, the Cohn brothers are sophisticated and experienced business men.  When Mark Cohn got out of prison, he discussed the possibility of getting involved in business with this brother. Mark Cohn then began to look for opportunities to do so.

### C.  AGK decides to sell

Kasper and Korpita together owned the Phoenix and Tucson franchises of Interim through their company, AGK.  In addition to the franchises in Arizona, Kasper was a minority partner in Interim franchises in the eastern United States, and he was based in Massachusetts.  Although he was not present on a daily basis, he was actively involved in the business.  According to Kasper, the success of the franchises varied, and Tucson was not as competitive as Phoenix.  Nevertheless, the Phoenix franchise was successful for a few years when it did a fair amount of supplemental staffing and a mix of Medicare and Veterans Administration ("VA") business.  The Phoenix office focused on VA business, along with supplemental staffing of hospitals, and some Medicare business.  Overall, however, the Phoenix office was not successful, despite realizing slim profits during some years.

At a certain point, Korpita decided that he wanted to exit the business, as Phoenix was operating at a loss because they could not generate enough sales volume in a highly competitive market.  As a result, it would have taken a significant investment of capital to get the Phoenix office to a point that it would be profitable, which in Korpita's view did not makes sense.  Therefore, Korpita sent a letter dated July 29, 2011 to Interim, addressed to Kathleen Gilmartin as President and CEO, informing Interim of AGK's intention to close.  *See* ECF No. [164-1]. Specifically, the letter stated as follows:

> Dear Ms. Gilmartin,
>
> It is with great disappointment that we are sending this letter to notify Interim HealthCare Inc. that we are giving our 120-day notice of closure.
>
> While we have tried for over 10 years, we have lost several hundred thousand dollars on this location and to be in this position leaves us with no choice but to close.

*Id*.  The letter was signed by Korpita and Kasper; however, Kasper did not agree with Korpita's desire to close.  After he found out about Korpita's letter, Kasper flew to Arizona and the disagreement ultimately led to Korpita retiring from the business in 2012.  After Korpita retired, Kasper attempted to run the business by himself remotely.  Eventually, Kasper became actively involved in attempting to sell the franchise.  Kasper found a partner named Devin Ringling, who was interested in the Tucson franchise, but not the Phoenix location.  Ringling's family had owned franchises for several decades and he was headquartered in Colorado Springs.  Eventually, Kasper sold the Tucson franchise to Ringling's company, and enlisted the help of Interim to try to find a suitable buyer for Phoenix.

### D.  Finding a buyer

Steven Turner, Interim's Senior Vice President for New Franchise Support, and Mike Bohannon, Interim's Director of New Franchise Development, became involved in helping Kasper find a buyer for the Phoenix office.  Sometime in early 2013, a franchise broker in Canada named Bernie Mindorff contacted Bohannon about franchises for sale, and Bohannon told Mindorff about the Phoenix franchise.  At the time, Mark Cohn was looking for opportunities to get involved in a business with his brother. He came across an advertisement for a non-medical home care business and called the broker, who happened to be Mindorff.  In response, Mindorff presented Mark Cohn with the Interim franchise as a potential option.  According to Mindorff, Mark Cohn was interested

in senior home care, and in a business that needed work.  However, Cohn also testified that he was

a bit reluctant because he had no experience in the medical or home health care.  Nevertheless,

Mindorff sent Mark Cohn a synopsis with information about the opportunity.  In pertinent part,

the email Mindorff sent Mark Cohn on April 11, 2013 stated:

> The name on this one is – Interim Health Care.
>
> Price - $250k firm
>
> Office Staff- 3
>
> Owners- Owner Operator passed away some time ago, and the other owner was just the investor, with no operational involvement.  He lives out of state.
>
> Territory- All of Maricopa County, and the northern half of Pinal County.  This would be equivalent to 10 or more territories of most of the other Senior Home Care Brands.
>
> Revenue- $1M, with current profit in the 40-50k range.  No one is managing this business right now, and it needs a strong turnaround plan, from owners with strong business experience, with assistance from the corporate Franchisor.   No medical or Senior Care experience is necessary.
>
> The company comes complete with a Medicaid License, which is very costly to acquire initially.
>
> The company will provide complete training to the purchasing owners in all phases of the business, as they would for any new franchisees.  They have a very strong ongoing support system as well.
>
> The company has both medical and non medical care, provides health care staffing for other medical facilities and keeps the clients from the initial non medical care, through the medical care stages, through to and including hospice.  A complete care, long term service provider.
>
> They have a depth of experience in private duty, skilled nursing, therapy, hospice and medical staffing, and the support team has a comprehensive understanding of the complex regulatory environment and provides ongoing guidance in each aspect of the

> business including finance, human resources, marketing, sales and
> training.
>
> They are one of the most established brands, with over 40 years in
> the business.

ECF No. [164-2].   According to Mark Cohn, Mindorff indicated that the company was not

mismanaged, but that it was not being actively managed because one of the owners had passed

away, and the other owner was too far away to actually manage the business.   Mindorff testified

that Bohannon had told him that the active owner in the Phoenix franchise had died and that the

other owner lived in Boston; and that the email he sent Mark Cohn contained information that

Bohannon had passed along about the Phoenix location.   At the time, Mindorff had not spoken to

Kasper. When Mindorff did speak with Kasper, Kasper confirmed that the Phoenix franchise was

a breakeven business.

After consulting with his brother, Mark Cohn decided that they were interested in moving

forward with potentially purchasing the Phoenix Interim franchise, and he contacted Interim.

### E.  HCH purchases Phoenix Interim franchise

The first person Mark Cohn spoke to was Bohannon, who confirmed the information

contained in the April 11, 2013 email that Mindorff sent and made several additional

representations.   Bohannon told Mark Cohn that the current owner was "babysitting" the business

since the other owner passed away, and the business was able to generate a million dollars with

$40,000.00 to $50,000.00 of income.   Bohannon also said that there was a ready market for the

Medicare certification.   When Mark Cohn shared his lack of experience in the relevant industry,

Bohannon assured him that Interim would be behind them engaged every step of the way, and that

Interim would help develop a business plan.   Bohannon said that Interim would provide specialized

experience, and that all that was needed from the franchisee was business experience.   Likewise,

when Mark Cohn asked about hiring a consultant, Bohannon assured him that it was not necessary. In addition, Bohannon told him the franchise was freely transferable at any time and sent a copy of the FDD to Mindorff to provide to Mark Cohn. However, prior to the sale of the Phoenix franchise, the Cohns were not provided with or told about the termination letter Korpita sent in 2011.

As part of the purchase and approval of new owners process, Mark and Steven Cohn traveled to Florida to meet with key Interim employees on what is known as the "discovery day." Discovery day is a step in the process when prospective new franchisees go to Interim corporate headquarters in Sunrise, Florida, meet the team, gain an understanding of how the company is structured and spend a day with the franchisor with prepared questions. It is intended to help the franchisor reach a decision regarding approval of a prospective franchisee. Steven Turner testified that Interim learned that the Cohns were experienced franchise owners and ran a background check on Steven Cohn, as he was to be the owner. The Cohns also met with Michael Slupecki, Interim's CFO at the time and Kathleen Gilmartin, Interim's CEO. As part of the process, the Cohns had the opportunity to review Interim's FDD.

Both Mark Cohn and Steven Cohn testified that they relied upon the information in the FDD in deciding to purchase the Phoenix franchise. In addition, Mark Cohn testified that he relied on the representations made by Bohannon. In terms of due diligence, Mark Cohn admitted that he did not conduct the type of investigation he otherwise would have had he suspected some type of fraud. He did online research on Interim, he reviewed the 2011, 2012, and 2013 financial statements of AGK, and he enlisted a law firm to conduct due diligence with respect to documentation and regulations. He also contacted and spoke to three or four other Interim franchise owners listed in the FDD, and he and Steven visited the AGK office in Phoenix. Steven

Cohn testified that Mark conducted the due diligence, though the information in the FDD impacted his understanding of the potential transaction.  He decided that he would be prepared to invest $400,000.00 into the business.

### F.  The FDD

The Cohns had the opportunity to review Interim's FDD.  In pertinent part, the FDD provides that the estimated initial investment amount for an Interim HealthCare Franchise Business with a single office location will range between $115,500.00 and $188,500.00.  ECF Nos. [162-2], [164-6], Item 7.  This estimate includes the initial franchise fee (which was waived for HCH), and expenses for real property, leasehold improvements, furniture, fixtures, equipment, opening advertising, vehicle wrap marketing, training, start-up supplies, insurance, utility deposits, professional and regulatory fees, business licensing, and additional funds over six months.  *Id.*

In addition, the FDD provides that Interim as the franchisor would have certain pre-opening and continuing obligations to a franchisee.  *Id.*, Item 11.  In pertinent part, the FDD states, "[b]efore you begin operation of the Franchise Business, the Franchise Agreement requires us to provide the training we deem necessary for your conduct of the Franchise Business (Franchise Agreement §7.1(a)).  You must complete our initial training program to our satisfaction prior to opening the Franchise Business."  *Id.*, "Pre-Opening Obligations."  With respect to training, the FDD provides that,

> [g]enerally, within thirty days before you open the Franchise Business . . ., we will provide you with a mandatory training program.  This training program shall consist of up to forty hours of classroom training at our headquarters in Sunrise, Florida, and up to forty hours of on-site training at your office location.

> When you open the Franchise Business, we will assign one of our representatives to your office, at our expense, for up to one week to provide you on-the-job training and assistance.

*Id.*, "Training."

Finally, the FDD states that Interim does "not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets.  We also do not authorize our employees or representatives to make any such representations either orally or in writing.  If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet."  *Id.*, Item 19.

### G.  The Franchise Agreement

Ultimately, the Cohns decided to move forward and Interim approved Steven Cohn as a potential franchisee, so Steven Cohn formed HCH.  HCH entered into an asset purchase agreement with AGK and purchased the Phoenix franchise for $225,000.  They also entered into a management agreement in order to transfer the Medicare license.  Steven Cohn, on behalf of HCH, signed a new Franchise Agreement ("FA") with Interim on August 30, 2013.  ECF No. [162-1], [164-7].

The FA provides in pertinent part that Interim "agrees to furnish or provide the following services or assistance in the operation of this franchise: (a) Train Franchisee in the operation of the franchise . . . ."  ECF Nos. [162-1], [164-7], §7.1.  In addition, the FA provides that "the relationship of Company [Interim] and Franchisee is that of franchisor and franchisee, and that in no even shall Company and Franchisee be considered partners, joint venturers, or agents of or for each other."  *Id.*, §9.  Finally, the FA contains a provision stating that "Company and Franchisee have each had ample opportunity to review this Agreement with their respective advisors prior to its execution, and this Agreement should therefore not be construed for or against either party."  *Id.* §20.

Although the FA provides that the majority shareholder, in this case Steven Cohn, would be engaged in the operation of the franchise on a full-time basis, Interim understood that Mark Cohn would be in an operating role.  Notwithstanding, Steven Cohn understood that he would be responsible for oversight and supervision.  The Cohns admit that neither individually disclosed Mark Cohn's conviction prior to execution of the FA with Interim.

### H.  HCH's experience operating Interim franchise

After HCH purchased the Phoenix franchise, the Cohns received two days of training in Florida, during which they were introduced to OASIS (a start of care document used for Medicare) and ORCA (Interim's online resource center).  They heard presentations about Interim's national sales program, risk management support, human resources, clinical support including organizational structure and regulations, IT systems, finance and accounting support, operations and sales support, and an overview of Medicare operations.  *See* ECF No. [162-7]  According to Mark Cohn, there was no training provided on clinical aspects, nor did Interim provide training on billing.  Steven Cohn testified that the Interim training focused mainly on ensuring clinical compliance, but there was no training on setting up the business or how to make the business work.  Mark Cohn testified that after attending the training, he did not feel that he could go to Phoenix and train his staff to operate the business.

When HCH took over the Phoenix office, they found it to be in disarray.  According to Dana Pierson, a longtime employee of the Cohns, the existing AGK office was not well organized, they had to get new equipment, and staff morale was low.  In addition, AGK carried out billing on paper, and the accounting was disorganized.  Mary Hahn, Interim's regional operations coordinator, testified that her role with respect to the Phoenix franchise was to be in touch with the office monthly and to conduct an annual visit if requested. This was in addition to performing an

audit to advise the office regarding compliance, and to make recommendations. Jeanne Byl, a regional operations consultant for Interim, also went to the Phoenix to provide support. Both Byl and Hahn testified extensively about how they spent much more time at the Phoenix office providing support than with any other office in her region. They visited the Phoenix office several times during HCH's ownership.

The evidence presented at trial establishes that the Phoenix office suffered multiple shortcomings, including lack of proper processes and training, office and field staff turnover, general disorganization, and lack of proper documentation, clinical judgment, and clinical oversight, which ultimately led to the inability to collect payments from multiple payers, especially the VA and Medicare. For example, Hahn testified that her tasks varied when she visited HCH, from conducting audits to try to gauge clinical compliance, providing orientation for the director of nursing, and even completing plans of care so that bills could be sent. She noted that at one point, there were almost 1000 incomplete plans of care, which prevented bills from being sent. According to Hahn, HCH's problem was not competition in the market, but internal operations.

Similarly, Byl testified that in addition to going to HCH to assist with Interlink, the electronic medical record, she participated in weekly phone calls to review HCH's progress in implementing the changes recommended by her and Hahn. She had the impression that Mark Cohn was not holding his staff accountable. In addition, it became clear that HCH was not using Interlink to its full potential in either its reporting or scheduling functions. *See, e.g.* ECF No. [162-6].

Rhianna Zastrow, who became HCH's office manager in 2015, testified that during her time working at HCH, there were three directors of nursing, as well as office turnover. She also testified that when she started, the office was disorganized and training was carried out mainly by

employees training one another.  She noted that there appeared to be a lack of communication and coordination between management and HCH staff, and between HCH and Interim.

In June 2014, Kathleen Gilmartin advised Steven Cohn that she had been contacted by other franchisees who were upset that there was a franchise in the organization that was owned and operated by somebody with a felony conviction.  Indeed, Michael Slupecki contacted Mark Cohn to speak about a 2004 Wall Street Journal article discussing his felony conviction, which had not been disclosed to Interim.  On June 19, 2014, Gilmartin sent Steven Cohn a letter expressing Interim's desire that Mark Cohn be removed from his daily involvement in HCH in directing and supervising the in-office staff.  The problems at HCH continued.

### I.   Termination of the franchise

Interim terminated HCH's franchise effective March 31, 2017.  After investing almost $2.4 million in HCH, Steven Cohn withdrew from his involvement in HCH in April 2017.  Interim billed HCH for $399,803.63 for past due royalty fees under the FA, which HCH did not pay.

### J.   AGK misstated its financial statements

Maria Ventura was the accountant for AGK beginning in 2005.  She performed accounting services for HCH after it acquired the Phoenix franchise.  She testified that when Devin Ringling purchased the Tucson office from AGK, his Colorado Springs office took over the accounting for both the Phoenix and Tucson offices, and that while she had been responsible for preparing the relevant financial statements through 2012, the Colorado Springs office prepared the 2013 financial statements for the Phoenix and Tucson offices.  Prior to HCH purchasing the Phoenix office from AGK, she was the point of contact during the due diligence period.  Ventura sent documents they requested to a shared file, and she provided the financial statements that she prepared from 2010 to 2012.  However, Kasper told her that she was not permitted to send the

most recent financial statement prepared by Colorado Springs.  Ventura testified that once the Colorado Springs office took over the accounting duties for both Arizona offices, the Tucson office profits were being used to offset the losses at the Phoenix office, making Phoenix look more successful than it was in reality.

Mark Cohn learned after the fact that the AGK financial statements were not accurate and it became clear that AGK and Ringling were purposely disguising the true financial situation of AGK with respect specifically to the Phoenix office.

## III.    CONCLUSIONS OF LAW

### A.  Breach of Contract

"[U]nder Florida law, franchise agreements are considered personal service contracts." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1506 (S.D. Fla. 1995) (citing *Burger Chef Sys., Inc. v. Burger Chef of Fla., Inc.*, 317 So. 2d 795, 797 (Fla. 4th DCA 1975)).  A party is liable for breach of a franchise contract if the following elements are proven: (1) a valid contract; (2) a material breach of that contract; and (3) damages resulting from the breach.  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)).  The non-breaching party may "choose between being placed in the position it would have been in had the contract been fully performed by seeking an award of lost profits or the position it would have been in prior to the breach, which would be accomplished through an award of reasonably foreseeable damages." *Burger King Corp. v. Hinton, Inc.*, 203 F. Supp. 2d 1357, 1366 (S.D. Fla. 2002) (citations omitted).  Thus, a non-breaching party may be entitled to expectation damages for breach of a franchise agreement.  *Hinton*, 203 F. Supp. 2d at 1366 (citing *Born v. Goldstein*, 450 So. 2d 262, 264 (Fla. 5th DCA 1984)); *Adams v. Dreyfus Interstate Dev. Corp.*, 352 So. 2d 76 (Fla. 4th DCA 1977).  Specifically, to recover expectation

damages, such as lost profits, a claimant must prove: (1) a breach of contract; (2) loss as a proximate result of the breach; (3) the loss was, or should have been within the reasonable contemplation of the parties; and (4) the loss is not remote, contingent, or conjectural and the damages are reasonably certain. *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1317 (11th Cir. 2001) (citations omitted) (applying Florida law). Importantly, "not only must the measure of damages be calculable to a reasonable certainty, but the cause of the loss must not be speculative." *R.A. Jones & Sons, Inc. v. Holman*, 470 So. 2d 60, 71 (Fla. 3d DCA 1985).

### i.   Interim's claims for breach of contract

Interim contends that HCH breached the FA by failing to pay royalty amounts due to Interim under the FA. Interim seeks damages for past due royalties and future royalties it would have collected had HCH not breached the FA. Upon review, the Court determines that Interim has met its burden of proving that HCH breached the FA because the FA is a valid contract, HCH does not dispute that it failed to pay amounts due as royalties, and HCH stipulated to the amount it was billed by Interim and did not pay. *See* ECF No. [133], ¶ 15. Moreover, for the reasons set forth more fully below with respect to HCH's counterclaims, HCH has failed to establish by a preponderance of the evidence that it did not breach the FA by failing to pay royalties due.

In support of its claims, Interim presented the testimony Steven Turner, the Senior Vice President of New Franchise Support for Interim. Turner testified that under the FA, HCH was obligated to pay Interim weekly royalties in the amount of 3.25% of gross revenues derived from Medicare and Medicaid sales, and 5.25% of gross revenues derived from all other sales, which is also reflected in the FA itself. ECF No. [162-1], [164-7], § 11.1. According to Turner's testimony and Interim's billing records admitted at trial, *see* ECF Nos. [162-3], [162-4], HCH failed to pay

15

a total of $399,803.63 in past due royalty fees under the FA, and there was no testimony or other evidence presented tying any purported royalty payments by HCH to specific Interim invoices.

In addition, Turner testified that the FA was terminated on March 31, 2017. As such, 334 weeks remained of the ten-year term for which HCH would owe Interim royalty fees. In order to calculate the amount of royalties Interim would have had to pay had the FA not been terminated, Interim calculated the average amount of royalties paid over the three years HCH operated the Phoenix franchise—$3,165.24—and multiplied the amount by the 334 weeks remaining, which yields a total of $1,057,190.16. Next, Interim calculated that the cost to support an office would be approximately $254 per week, which for 334 weeks remaining on the FA totaled $84,945.00 in support fees. Accordingly, the total amount of future royalties owed to Interim is $972,245.16.

### ii.    HCH's counterclaim for breach of contract

HCH contends that Interim breached the FA by failing to provide the necessary services contemplated under §7.1 of the FA—especially training; by providing incorrect legal advice; by providing inappropriate, incomplete and inaccurate advice about the establishment and operation of a Medicare-certified skilled intermittent home health and home care services business, including incomplete training on billing, misguiding HCH on hiring of key individuals; and by demanding that Mark Cohn be removed from a managerial position.

Upon review, however, none of Interim's actions amount to a breach of the FA because Interim was not required by the FA to provide any of the specific services HCH contends Interim failed to provide. First, with respect to training, the FA states only that Interim would "train franchisee in the operation of the franchise," ECF No. [162-1], [164-7], and the FDD provides that "the Franchise Agreement requires us to provide the training we deem necessary for your conduct of the Franchise Business." ECF Nos. [162-2], [164-6], Item 11. In addition, the FDD states in

bold typeface that "**[e]xcept as listed below, we are not required to provide you with any**

**assistance**." *Id*. The evidence in this case demonstrates that Interim provided HCH with its

mandatory training program after HCH purchased the Phoenix franchise, which by the terms of

the FDD would "consist of **up to** forty hours of classroom training at our headquarters in Sunrise,

Florida, and **up to** forty hours of classroom training at your office location." *Id*. (emphasis added).

During trial, Interim's employees and officers provided testimony demonstrating that Interim

provided more support and training to HCH and the Phoenix franchise than it usually did to other

franchisees, even where the FA states specifically that it was HCH's responsibility to train its own

employees. *See* ECF No. [162-1], [164-7], §8.2. HCH, through Mark Cohn, may not have been

satisfied with the amount and content of the training. However, that dissatisfaction does not create

a breach of contract absent representations in the FA that specific content training would be

provided. Pursuant to the FA, the determination of the training necessary rested with Interim.

Second, with respect to legal and other advice about the establishment and operation of a

Medicare-certified skilled intermittent home health and home care services business, the FA

similarly contains no specific provision for these services. Indeed, the FA specifies that "the

relationship of Company and Franchisee is that of franchisor and franchisee, and [] in no event

shall Company and Franchisee be considered partners, joint venturers, or agents of or for each

other. . . . Company shall not, as the result of any approvals consents, advice or services provided

to Franchisee pursuant to this Agreement or otherwise, assume responsibility or liability to which

Company would not otherwise be subject, to Franchisee or to any third party." ECF No. [162-1],

[164-7], §9. Moreover, the FDD states multiple times that Interim did "not anticipate that you will

seek Medicare certification until the Franchise Business has been firmly established." *See* ECF

Nos. [162-2], [164-6], Item 6 n.1, 5; Item 7 n.16. While HCH contends that the FDD did not apply

to a Medicare-certified agency like the Phoenix office, the Court disagrees. The testimony at trial established that the bulk of the Phoenix office's business derived from the VA and not Medicare. The fact that HCH acquired AGK's Medicare certification through the transfer of assets did not obligate HCH to drive up Medicare business, or otherwise render the FDD inapplicable.

Third, with respect to hiring, the FA is clear that "Franchisee shall be solely responsible for all decisions regarding hiring, training, placement, supervision, counseling, discipline and termination of such employees, and for the quality of services provided by such employees." ECF No. [162-1], [164-7], §8.2.

Fourth, the removal of Mark Cohn based upon his undisclosed conviction did not breach the FA. Steven Cohn acknowledged that Interim had granted the franchise based on its investigation of Steven Cohn's qualifications. *Id.*, §10 ("Franchisee hereby represents that Steven Cohn is the sole shareholder of Franchisee. . . . Shareholder[] hereby acknowledge[s] that Company has granted the within franchise to Franchisee, based primarily upon Company's investigation and reliance upon the qualifications of Shareholder[].").  In addition, it is undisputed that the Cohns failed to disclose the conviction prior to entering the FA. It is further undisputed that the failure to disclose was intentional and deliberate, after they consulted with counsel who determined that Mark Cohn's financial related conviction did not disqualify him from operating in the healthcare context.  Notwithstanding, the FA obligates a franchisee to "develop, maintain and promote the business and public image of Company . . . ," *id.* §8.4, and Steven Cohn acknowledged that Interim's concern with Mark Cohn's involvement was based upon three factors, including the potential consequences for him, to the Medicare certification, and brand representation.  Tellingly, Steven Cohn conceded that full disclosure would have been better. *See* ECF No. [162-9].

Case No. 17-cv-61378-BLOOM/Valle

Finally, it bears noting that the FA required Steven Cohn to be involved in the operation of the franchise on a full-time basis absent Interim's consent in writing.  ECF No. [162-1], [164-7], §6.  However, with Steven Cohn's knowledge, Mark Cohn undertook the responsibility for daily operations of the HCH franchise, which was contrary to Interim's understanding of how responsibilities at HCH would be carried out.  *See* ECF Nos. [162-8], [162-9].

Most importantly, the FA contains a merger and integration clause and various disclaimers with respect to any purported representations made prior to, and outside of, those contained within the FA itself.  In pertinent part, the FA states as follows:

> This Agreement, all exhibits to this Agreement and all ancillary agreements executed contemporaneously with this Agreement constitute the entire agreement between the parties with reference to the subject matter of this Agreement and supersede any and all prior negotiations, undertakings, representations and agreements; provided, however, that nothing in this Agreement or any related agreement is intended to disclaim the representations made in Company's Franchise Disclosure Document furnished to Franchisee.  Franchisee acknowledges and agrees that Franchisee is entering into this Agreement, and all ancillary agreements executed contemporaneously with this Agreement, as a result of Franchisee's independent investigation of the franchise offered by Company and not as a result of any representations about Company or the Franchise Business made by Company or its shareholders, officers, directors, employees, agents, representatives, independent contractors, attorneys or franchisees which are contrary to the terms set forth in this Agreement or any franchise disclosure document, offering circular, prospectus or other similar document required or permitted to be given to Franchisee pursuant to applicable law.

ECF No. [162-1], [164-7], §20.8.

In Florida, it is well settled that representations which are made before or during the signing of a contract, such as those allegedly made to Mark Cohn by Bohannon, "are presumed to have merged in the written agreement."  *First Union Discount Brokerage Servs. v. Milos*, 744 F.Supp. 1145, 1153 (S.D. Fla. 1990) (citing *Azar v. Richardson Greenshields Sec., Inc.*, 528 So. 2d 1266,

1269 (Fla. 2d DCA 1988)).  Oral statements between the contracting parties prior to or during the

execution of a contract merge into the subsequent written contract.  *Valenti v. Coral Reef Shopping

Ctr., Inc*., 316 So. 2d 589, 592 (Fla. 3d DCA 1975).  Neither the FDD nor the FA contain any of

the representations allegedly made by Bohannon to Mark Cohn.  Thus, HCH has failed to show

that Interim breached any provision of the FA.

**B.  Breach of the Covenant of Good Faith and Fair Dealing**

"A breach of the implied covenant of good faith and fair dealing is not an independent

cause of action but attaches to the performance of a specific contractual obligation."  *Centurion

Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005).  The implied

duty of good faith must therefore "relate to the performance of an express term of the contract . . .

[and] cannot be used to vary the terms of an express contract."  *Burger King Corp. v. Weaver*, 169

F.3d 1310, 1316 (11th Cir. 1999) (quoting *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc*., 710 So. 2d

573, 575 (Fla. 4th DCA 1998) and *City of Riviera Beach v. John's Towing*, 691 So. 2d 519, 521

(Fla. 4th DCA 1997)).  Further, the covenant cannot "add an obligation to the contract which was

not negotiated by the parties and not in the contract."  *Hosp. Corp. of Am*., 710 So. 2d at 575.

Because HCH has failed to show breach of any contractual provisions in this case, its claim

for breach of the covenant of good faith and fair dealing also fails.

**C.  Florida Deceptive and Unfair Trade Practices Act**

Florida's Unfair and Deceptive Trade Practices Act ("FDUTPA") declares that "unfair or

deceptive acts or practices in the conduct of any trade or commerce" are unlawful.  Fla. Stat.

§ 501.204(1).  "The Florida Supreme Court has noted that 'deception occurs if there is a

representation, omission, or practice that is likely to mislead the consumer acting reasonably in the

circumstances, to the consumer's detriment.'"  *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281,

1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)).   The purpose of FDUTPA, a consumer-protection statute, is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."   Fla. Stat § 501.202(2).   Businesses and corporations that purchase goods or services are included in the definition of "consumers" under the statute.   Fla. Stat. § 501.203(7). "To state a claim under FDUTPA, a plaintiff must allege (1) a deceptive or unfair practice in the course of trade or commerce, (2) causation, and (3) actual damages."   *Benjamin v. CitiMortgage, Inc.*, No. 12-62291-CIV, 2013 WL 1891284, at *4 (S.D. Fla. May 6, 2013) (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)).

HCH contends that Interim engaged in deceptive and unfair trade practices by making several false statements, misrepresentations, or omissions, including (1) that the sale of the Phoenix franchise arose in part due to the death of one of the owners, rather than because the franchise had a ten-year record of losses; (2) the AGK financials provided misrepresented that the Phoenix office was a breakeven business; (3) Interim failed to inform HCH that AGK had intended to close based on ten years' worth of losses; (4) the FDD provided to HCH misrepresented the financial expenses associated with a Medicare-certified agency; (5) the FDD did not apply to a Medicare-certified agency; and (6) that the franchise was freely transferable.   HCH relied upon these alleged misrepresentations and omissions when it purchased the Phoenix franchise from AGK.

The Court finds that HCH has failed to establish by a preponderance of the evidence that any of the alleged misrepresentations or omissions were likely to mislead a consumer acting reasonably under the circumstances.   First, in the FA, HCH expressly warranted that:

(a) Franchisee has placed no reliance on any oral or written statements, whether referred to as representations, warranties, inducements or otherwise, which are not contained in this Agreement or in Company's Franchise Disclosure Document furnished to Franchisee;

(b) Franchisee has entered into this Agreement after making an independent investigations of Company's operation and the franchise offered by Company;

(c) Company has not made any guarantee or provided any assurance that the Franchise Business will be successful or profitable regardless of the fact that Company may have approved of the location of the office of the Franchise Business;

(d) Franchisee has (i) read this Agreement in its entirety and understands its contents, (ii) been given the opportunity to clarify any provisions that Franchisee did not understand, and (iii) had the opportunity to consult with professional advisors regarding the operation and effect of this Agreement and the operation of the Franchise Business;

(e) Franchisee has, together with its advisors, sufficient knowledge and experience in financial and business matters to make an informed decision with respect to the franchise offered by Company; and

(f) Franchisee has received a copy of Company's Franchise Disclosure Document . . . .

Except as may have been disclosed in Company's Franchise Disclosure Document, Franchisee represents and warrants to Company that no claims, representations or warranties regarding earnings, sales, profits, success or failure of the Franchise Business have been made to Franchisee, and no such claims, representations or warranties have induced Franchisee to enter into this Agreement.

ECF No. [162-1], [164-7], §20.8.  As already determined, the Cohns are sophisticated and experienced business men, and Mark Cohn had several months to conduct the necessary due diligence prior to HCH entering into the FA.  By his own admission, he reviewed AGK's financial information, but he did not have the industry knowledge to understand the percentages, and he did not conduct an exhaustive investigation.  Based upon the evidence presented at trial, the due

diligence he performed, and which Steven Cohn relied upon, was cursory at best.  There was no evidence presented to establish that Interim engaged in any attempt to conceal information from HCH that HCH could have discovered through its own due diligence.  Moreover, Maria Ventura's testimony established that any affirmative misrepresentation or omission occurred as a result of the conduct of Kasper and Devin Ringling, not Interim.  HCH contends that Interim must have known because Interim received financial information from AGK and was generally aware that the Phoenix office did not perform well.  However, there was no supporting evidence that Interim was aware that Kasper and Devin Ringling had used the profits from the Tucson office to offset losses of the Phoenix office. In fact, Michael Slupecki testified that Interim did not scrutinize its franchisees' finances.

Second, to the extent that HCH's claim relies upon misrepresentations contained in Item 7 of the FDD, the evidence reveals otherwise. Mark Cohn testified that most of the items did not apply to the purchase of the Phoenix franchise, including the estimates for certification, office space, leasehold improvements, the initial fee, opening advertising and vehicle wrap, start-up supplies, professional fees, and insurance.  Indeed, he conceded that the only items that applied were business licenses and regulatory fees.  Thus, by his own admission, Mark Cohn was aware that many of the categories listed in Item 7 of the FDD did not apply to the Phoenix franchise.  In addition, Steven Cohn testified that he determined that he would be prepared to invest $400,000.00 in the Phoenix franchise business, which number was not taken directly from the FDD.  Therefore, any reliance upon Item 7 would not be reasonable and the Court finds that the Cohns did not rely on Item 7.

Case No. 17-cv-61378-BLOOM/Valle

Third, contrary to HCH's contention, Lloyd Strothman, Interim's franchise counsel, testified that the FDD provided to the Cohns would have covered HCH's FA and that the FDD accurately discloses the terms of the FA.

Finally, there is no evidence of any misrepresentation with respect to the ability to resell the franchise.  HCH contends that because Interim failed to disclose the 36-month rule applicable to a Medicare certification, *see* 42 C.F.R. § 424.550, Bohannon's representation that the franchise was freely transferable was misleading.  However, the representation that the franchise was freely transferable is consistent with the FA, which provides that "Franchisee shall have the right to sell the franchise granted herein, or all (but not part) of the business and assets owned or utilized by Franchisee in the operation of such franchise, to such person or persons as shall have first been approved in writing by Company."  ECF No. [162-1], [164-7], §15.1.  The fact that a Medicare certification may not be transferable for 36 months after transfer of ownership of a home health agency does not otherwise render the franchise itself not transferable.  This is especially so in the instant case, where the bulk of HCH's business involved VA and not Medicare, and Mark Cohn decided to increase HCH's Medicare business in attempts to create cash flow.

Accordingly the Court finds that Interim did not violate the FDUTPA.

**D.  Fraud in the Inducement**

"Under Florida law, the essential elements of a cause of action for fraud are: (1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage or injury.  *Pitts Sales, Inc. v. King World Prods., Inc.*, 383 F. Supp. 2d 1354, 1362-63 (S.D. Fla. 2005) (citing *Nat'l Ventures, Inc. v. Water Glades 300 Condo. Ass'n*, 847 So. 2d 1070, 1074 (Fla. 4th DCA 2003); *Ward v. Atlantic*

*Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001)).  "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely . . . but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior."  *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1240 (Fla. 1996) (citation omitted).

HCH contends that Interim fraudulently induced it into entering the FA by falsely stating that Korpita had died, that the Phoenix franchise was operating at a profit when AGK had sent a letter of termination two years earlier, by failing to convey the financial struggles of the Phoenix office, and by representing that the franchise would be freely transferable when the 36-month rule would apply to the Medicare certification.

Upon review, the Court determines that this claim, like the FDUTPA claim, fails based upon the warranties made by HCH in the FA.  *See* ECF Nos. [162-1], [164-7], §20.8.  The fraud claim further fails because "[r]eliance upon oral representations, even if false, is unreasonable if the party enters into a subsequent agreement."  *Schubot v. McDonalds Corp.*, 757 F. Supp. 1351, 1356 (S.D. Fla. 1990) (citation omitted).  The alleged omissions and misrepresentations in this case were made prior to execution of the FA, in which HCH expressly disclaimed reliance on any representations made outside of the agreement.  Therefore, HCH's reliance upon the representations made before entering the FA was not reasonable.

### E.  Florida Franchise Act

The Florida Franchise Act ("FFA") provides in pertinent part that "[i]t is unlawful, when selling or establishing a franchise . . . for any person: 1. [i]ntentionally to misrepresent the prospects or chances for success of a proposed or existing franchise or distributorship; or 2. [i]ntentionally to misrepresent, by failure to disclose or otherwise, the known required total

investment for such franchise or distributorship . . . ."  Fla. Stat. § 817.416(2)(a).  "A franchisee must demonstrate 'proof of intentional words or conduct by the franchisor, concerning the prospects or chances of success of the enterprise, which were relied upon by the franchisee to his detriment, and which are not in accordance with the facts.'"  *Hall v. Burger King Corp*., 912 F. Supp. 1509, 1529 (S.D. Fla. 1995) (quoting *Travelodge Int'l, Inc. v. Eastern Inns, Inc.*, 382 So. 2d 789, 791 (Fla. 1st DCA 1980)).

Upon review, HCH's FFA claim fails because the FA contains a detailed disclaimer and encouraged HCH to perform its own due diligence and independent investigation.  *See* ECF No. ECF Nos. [162-1], [164-7], §20.8.  In addition, Mark Cohn conceded that while Slupecki told him about what he thought profit margin percentages should be for a franchise like Phoenix, he understood that Slupecki was not guaranteeing a certain level of profit.  Therefore, HCH has failed to establish a violation of the FFA.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has met its burden of establishing a breach of contract, and judgment will therefore be entered in favor of Plaintiff upon its breach of contract claims.  Moreover, the Court finds that Defendant has failed to meet its burden to establish any of its counterclaims, and therefore judgment must be entered in favor of Plaintiff upon Defendant's counterclaims.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter judgment by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 19, 2019.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Case No. 17-cv-61378-BLOOM/Valle

Copies to:

Counsel of Record